IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | |
| | : | |
| CHARLES THOMPSON | : | NO. 15-cr-222 |

## MEMORANDUM

**L. Felipe Restrepo, J.**                                    **September 2, 2015**

Defendant Charles Thompson ("Thompson") is charged with being a convicted felon in possession of a firearm.  ECF No. 1.  Thompson moves to suppress a .22 caliber Jiminez Arms handgun, Model JA22, serial number 1146326, and the four rounds of ammunition that were loaded in that handgun.  The handgun and ammunition were recovered from the corner of a parking lot at 310 W. Chelten Avenue, where Thompson was seen urinating in public.  ECF No. 13 at 2.  Upon consideration of Thompson's motion (ECF No. 12), the opposition thereto (ECF No. 13), and the evidentiary hearing and argument conducted on August 17, 2015 (ECF Nos. 21, 24) ("Hr'g Tr."), Thompson's Motion to Suppress will be denied for the reasons that follow.

### I. Findings of Fact

1.      On the evening of April 17, 2015,[1] Philadelphia Police Department ("PPD") Officers Victor Rodriguez and Robert Harris were on routine patrol in Police Service Area 1 of the 39th Police District in the City of Philadelphia.  Hr'g Tr. 7:13-19, 47:16 – 48:3.

2.      Among other things, the officers were on the lookout for incidents of "theft from auto," due to the high number of reported car break-ins in that area of the city.  Hr'g Tr. 8:19 – 9:7.

---

[1]      Initially, counsel for the Government misspoke and identified April 15, 2015, as the relevant day at issue.  Hr'g Tr. 7:20-24.  Counsel for Thompson subsequently corrected the record during cross examination that the relevant day was April 17, 2015.  Hr'g Tr. 45:20-24.

3.      The officers were in uniform and operating a standard PPD marked patrol car; Officer Rodriguez was the driver, and Officer Harris was the "recorder," that is, sitting in the front passenger seat.  Hr'g Tr. 8:2-18.

4.      At approximately 8:34 PM, the officers were driving eastbound on W. Chelten Avenue, between Morris Street and Pulaski Avenue, when Officer Rodriguez observed three males standing in a parking lot located next to 310 W. Chelten Avenue.  Hr'g Tr. 11:6 – 13:16.

5.      As he drove by, Officer Rodriguez noticed one of the males, later identified as Thompson, walk away from the other two towards the rear of the parking lot.  Hr'g Tr. 13:10-16.

6.      In order to investigate their presence in the parking lot, Officer Rodriguez turned the patrol car right onto Pulaski Avenue, and then right again onto W. Woodlawn Street (Hr'g Tr. 13:17 – 14:3); W. Woodlawn Street is a dead end on that block due to a fence that cordons off the nearby SEPTA tracks (Hr'g Tr. 54:6-16, 65:24 – 66:2).

7.      As the patrol car turned onto W. Woodlawn Street, the patrol car's headlights were pointed at the fence at the end of the block, and Officer Rodriguez turned on the spotlight affixed to the driver's side of the vehicle and pointed it towards the fence; the area was also illuminated by overhead street lights.  Hr'g Tr. 14:3 – 15:23.

8.      Upon making the turn onto W. Woodlawn Street, Officer Rodriguez observed Thompson in the rear corner of the parking lot, immediately to the right of a fire hydrant, facing the fence, with his back angled.  Hr'g Tr.14:3-22, 19:22 – 20:24, 58:15-21, 59:18-25.

9.      Though Officer Rodriguez could only see the back half of Thompson, Officer Rodriguez could tell that Thompson was urinating in public based on his body position and because he "saw the stream" of urine.  Hr'g Tr. 57:5-8, 58:21-25.

2

10. When the patrol car was approximately 20 feet from Thompson's location, Officer Rodriguez observed Thompson reach into his front right pants pocket with his right hand and remove a handgun. Hr'g Tr. 22:20 – 23:2; 23:12-22, 37:6-20.

11. Officer Rodriguez observed Thompson drop the handgun approximately one foot to the right of Thompson's body, to the right of the fire hydrant (Hr'g 23:23 – 24:9); this occurred while Thompson continued to maintain the urination posture and use his left hand to facilitate urination (Hr'g Tr. 64:2 – 65:4).

12. After observing this, Officer Rodriguez continued to drive on W. Woodlawn Street towards Thompson's position along the fence, stopped the patrol car approximately five feet short of Thompson's position, and turned the car slightly to the right so that it was angled toward the rear entrance/exit of the parking lot at 310 W. Chelten Avenue. Hr'g Tr. 21:25 – 22:4, 74:8-14.

13. The gates to both the front and rear of the parking lot at 310 W. Chelten Avenue were open throughout the course of the encounter. Hr'g Tr. 54:20 – 55:5.

14. Upon stopping the patrol car, Officer Rodriguez exited the vehicle and said words to the following effect to Thompson: "Come here. What's your name?" Hr'g Tr. 21:20-24, 23:3-5, 74:20 – 75:13.

15. Immediately after Officer Rodriguez finished speaking, Thompson began to run through the parking lot, between the parking lot light posts and the side of 310 W. Chelten Avenue, towards W. Chelten Avenue. Hr'g Tr. 23:3-10, 25:12-18, 75:14 – 76:24.

16. As soon as Thompson began to run, Officer Rodriguez pursued him on foot; during the brief chase, Officer Rodriguez was approximately four to five feet behind Thompson. Hr'g Tr. 25:19-24, 27:19-21, 77:5-7.

17.     As Thompson exited the parking lot through the pedestrian entrance/exit to the parking lot, he fell to the ground, got up, turned left onto the sidewalk of W. Chelten Avenue, and then turned left again to run back through the vehicle entrance/exit of the parking lot he had just exited.  Hr'g Tr. 25:25 – 26:8, 26:18 – 27:12, 77:8-17.

18.     While Officer Rodriguez pursued Thompson on foot, Officer Harris got in the driver's seat of the patrol car and began to drive it from its position at the W. Woodlawn Street entrance/exit towards W. Chelten Avenue; as Thompson reentered the parking lot, Officer Harris used the car to cut off Thompson from running farther into the parking lot.  Hr'g. Tr. 26:9-13, 28:7-17, 78:2-15.

19.     Officer Rodriguez caught Thompson mid-block in the parking lot, and physically stopped him from running farther.  Hr'g Tr. 78:12-15, 26:9-13, 27:23 – 28:12.

20.     Having physically stopped Thompson, Officers Rodriguez and Harris detained Thompson, with Officer Harris responsible for controlling Thompson's movement.  Hr'g Tr. 28:18-23, 79:16-21.

21.     After detaining Thompson, Officer Rodriguez pursued the other two males who were initially spotted in the parking lot with Thompson; around the time the officers approached Thompson via car on W. Woodlawn Avenue, these two males had walked out of the parking lot towards W. Chelten Avenue, and had turned to the right towards Pulaski Avenue.  Hr'g Tr. 28:18 – 30:1, 79:16 – 80:1.

22.     Officer Rodriguez caught up with the two males just past the Delmar bar, located on W. Chelten Avenue, grabbed them by the back of their pants and escorted them back to the parking lot for investigation; the two males complied with Officer Rodriguez's instructions. Hr'g Tr. 29:20 – 31:15.

4

23.     After Officer Rodriguez escorted the two males back to the parking lot, Officer Rodriguez returned to the area where he observed Thompson drop the handgun and recovered it from the ground; additional officers arrived on the scene as backup a minute or two later.  Hr'g Tr. 79:22 – 81:5.

24.     The Jiminez Arms handgun dropped by Thompson was loaded when it was recovered by Officer Rodriguez, but Officer Rodriguez immediately removed all four bullets from the handgun – one bullet from the chamber and three bullets from the magazine.  Hr'g Tr. 36:11-24.

25.     The other two males provided their names to Officer Rodriguez, and he checked their names against police databases; one of the males had a scofflaw warrant and was issued a new subpoena for traffic court, after which both males were released.[2]  Hr'g Tr. 31:19 – 32:5.

26.     Thompson, who had been placed in the back seat of the patrol car at this point, responded to the officers' questions about his name by stating that his name was "Robert Thompson" and giving an incorrect date of birth.  Hr'g Tr. 33:1-11.[3]

27.     After several minutes, Thompson provided his real name and date of birth to the officers.  Hr'g Tr. 33:12 – 34:4.

28.     Following Thompson's arrest, Officer Rodriguez transported Thompson to a PPD facility and placed him in a holding cell.  Hr'g Tr. 39:2-9.

29.     After placing Thompson in the holding cell, Officer Rodriguez placed the Jiminez Arms handgun and ammunition on a property receipt, provided that property receipt and other

---

[2]     At approximately 8:36 PM, the two males identified themselves to the officers as Allen Robinson and Jerome Timmons, as confirmed by the corresponding Computer Assisted Dispatch ("CAD") report. See Def. Ex.10.
[3]     The corresponding CAD report shows that the officers attempted to check the name "Robert Thompson" at 8:42 PM, and then checked the name "Charles Thompson" at 8:54 PM.  See Def. Exs. 10 and 10A.  This version of events directly corresponds with Officer Rodriguez's independent recollection of those same events.

paperwork to the district detectives, and then dropped off the handgun and ammunition at the

Firearms Investigation Unit, located at 8th Street and Poplar Street.  Hr'g Tr. 39:2 – 42:9.

## II.  Discussion

Thompson's written briefing in support of his motion to suppress argued that: "the

allegation that he was urinating was mere pretext.  As such, there were no facts to support

reasonable suspicion that criminal activity was afoot; the seizure of Mr. Thompson violated his

Fourth Amendment rights."  Def.'s Mot. to Suppress 1.  Thompson's moving papers later

clarified that, "Mr. Thompson was seized when the officers cornered him in the parking lot" and

this "seizure was not supported by reasonable suspicion."  Id. at 2, 5.  Based on such statements,

and the additional details and arguments outlined in Thompson's moving papers, it appeared that

Thompson was advancing a legal theory similar to the one successfully employed by the

defendant in United States v. Lowe, ___ F.3d ___, 2015 WL 4032921 (3d Cir. July 2, 2015).

However, as confirmed by counsel for Thompson during the argument that followed the hearing,

Thompson has abandoned his legal argument with respect to the timing of the seizure and is now

pursuing a purely credibility-based attack on the Government's version of events as described by

Officer Rodriguez.[4]  As stated by counsel for Thompson, "the most significant event that

happened that night, Your Honor, is Mr. -- Officer Rodriguez seeing Mr. Thompson drop the

---

[4]      See Hr'g Tr. 117:1-4 ("THE COURT: What's our theory of – what's your theory here?  Are you
suggesting that the officer is not telling the truth?; MS. MEEHAN: Correct."); 117:11-13 ("THE
COURT: So it's a credibility determination?; MS. MEEHAN: That's correct."); 125:7 – 125:21 ("THE
COURT: But let me just be clear.  So if I were to accept the police officer's facts, you're not making a
legal challenge to this -- to these facts . . . Because your -- the papers were very different than the
argument you're making now.; MS. MEEHAN: Understood, Your Honor, but the testimony was vastly
different from what -- from the information I had at the time that the motion was filed.; THE COURT: I
understand that.  So your argument is a credibility argument?; MS. MEEHAN: Essentially, Your
Honor."); 126:1-14 ("THE COURT: Okay.  So you're not making a legal argument?; MS. MEEHAN:
No, Your Honor.; THE COURT: This is strictly credibility?; MS. MEEHAN: Essentially, Your Honor.;
THE COURT: No, not essentially.  It is, or it's not.  Are you making -- your papers were a legal
argument.; MS. MEEHAN: Yes.  Yes, Your Honor.; THE COURT: So you're not making that argument?
MS. MEEHAN: No, Your Honor.").

gun, according to him . . . [a]nd I'm saying that's -- that's just not what happened, that's not what transpired, and that's why it's not reflected [in the CAD reports]."  Hr'g Tr. 120:21 – 121:3.

     A.  Credibility

On a motion to suppress, the judge sits as the fact finder and is empowered to make any necessary credibility determinations.  See United States v. Harris, 507 F.2d 197, 198 (3d Cir. 1975) ("As a jury is at liberty to make findings of credibility without a reasoned explanation, so may a judge sitting as a fact finder."); see also Government of the Virgin Islands v. Gereau, 502 F.2d 914, 921 (3d Cir. 1974) (holding that "credibility determinations are uniquely the province of the fact-finder") abrogated on other grounds by Corley v. United States, 129 S. Ct. 1558 (2009); United States v. Scarfo, 180 F. Supp. 2d 572, 576 (D.N.J. 2001) ("It is settled that at a hearing on a motion to suppress, 'the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions, and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." (quoting United States v. McKneely, 6 F.3d 1447, 1452-53 (10th Cir. 1993))).  Some of the factors to be considered in determining credibility include:

> (1) the opportunity and ability of the witness to see or hear or know that things about which the witness testifies; (2) the quality of the witness knowledge, understanding, and memory; (3) the witness appearance, behavior, and manner while testifying; (4) whether the witness has an interest in the outcome of the case of any motive, bias, or prejudice; (5) any relation the witness may have with a party in the case and any effect that the verdict may have on the witness; (6) whether the witness said or wrote anything before trial that is different from the witness testimony in court; whether the witness testimony is consistent or inconsistent with other [believable evidence]; and (8) any other factors that bear of whether the witness should be believed.

Third Circuit Model Criminal Jury Instructions, Instruction 1.10 - Credibility of Witnesses.

At the suppression hearing, Officer Rodriguez was the only fact witness to testify.[5] Having considered all of the factors set forth above, this Court finds, without reservation, that Officer Rodriguez's testimony at the suppression hearing was entirely credible in all respects. Officer Rodriguez appeared calm, poised, and confident throughout the course of his testimony. In light of the environmental circumstances, ample lighting, and his close physical proximity to Thompson throughout the course of the encounter, Officer Rodriguez had an excellent opportunity to observe all of the events about which he testified. Officer Rodriguez's recall of the sequence of events and important details about those events was strong, and where he could not recall a piece of information he was able to refresh his recollection by reviewing relevant paperwork that he or Officer Harris prepared on or around April 17, 2015. Officer Rodriguez's testimony was consistent with the contemporaneously prepared police paperwork, as well as with his testimony at the preliminary hearing that was conducted in Pennsylvania state court.[6]

Counsel for Thompson argued that the CAD reports undermine Officer Rodriguez's testimony about seeing Thompson drop the handgun because they were each coded as a "Priority 2" and not a "Priority 1" ("Priority 1" is the designation for police radio calls identifying a "man with a gun"). Hr'g Tr. 100:17 – 101:3, 117:8-25. However, the priority levels are assigned by the police dispatchers, not by the officer in the street. Hr'g Tr. 108:5-25, 118:16-20.

---

[5]     Caneshia Bailey also testified at the suppression hearing, but testified in the capacity of a records custodian, and as an individual with specialized knowledge to assist the Court in reading and understanding the CAD reports admitted into evidence by Thompson.

[6]     Though counsel for Thompson attempted to impeach Officer Rodriguez by omission with respect to the fact that he observed Thompson draw the handgun from his front pants pocket, that impeachment attempt failed to overcome the numerous indicia of credibility and independent corroboration of Officer Rodriguez's testimony. In all previous instances, Officer Rodriquez either wrote or testified that Thompson had the handgun in his right hand before dropping it to his right side – which is entirely consistent with his testimony at the suppression hearing. That Officer Rodriguez did not previously include that he observed Thompson reach into his right front pocket does not undermine Officer Rodriguez's credibility – using one's right hand to reach into one's right front pocket is a routine, unremarkable occurrence (indeed, one does not typically use one's right hand to procure something from one's left front or left rear pocket).

8

Furthermore, the "Priority 2" designation for the "Investigate Person" call is consistent with the initial parameters of Officer Rodriguez's action – checking on three males standing in a parking lot, one of whom the officer eventually observes urinating in public.  Hr'g Tr. 92:20-25.  In addition, the "Priority 2" designation is consistent with Officer Rodriguez's testimony that he did not call out, either to Officer Harris or to dispatch, that he observed a gun before he started chasing Thompson as he fled.  Hr'g Tr. 73:9-21, 85:4-13.  There are numerous other aspects of the CAD reports that confirm aspects of Officer Rodriguez's testimony, including: (1) two other individuals, Robinson and Timmons, were temporarily detained in addition to Thompson (compare Hr'g Tr. 28:24 – 32:5, with Def. Ex. 10); (2) Thompson initially gave a false name and birthdate (compare Hr'g Tr. 33:1-11, with Def. Ex. 10); (3) Thompson eventually gave the officers his correct name and birthdate (compare Hr'g Tr. 33:12-15, with Def. Ex. 10A); and (4) backup was called immediately (compare Hr'g Tr. 80:11-14, 84:8-10, with Def. Ex. 10).  Officer Rodriguez's testimony is corroborated by more than just the CAD reports – for example, the Biographical Information Report for Thompson (a/k/a the "229") shows that he was wearing blue jeans on the night in question – pants with front pockets.  Hr'g Tr. 82:4-22.

Officer Rodriguez's testimony at the suppression hearing will be credited in full, as the Court finds no legitimate reason to question the truth or accuracy of his statements.  Having made the necessary credibility determinations, the Court must determine the timing of the seizure that occurred in this matter, whether reasonable suspicion existed at that time that seizure took place, and whether the handgun should be suppressed in light of these determinations.

B.  Timing of the Seizure

The Fourth Amendment to the United States Constitution protects persons "against unreasonable searches and seizures."  U.S. Const. amend. IV.  Typically, for a seizure to be

9

considered reasonable under the Fourth Amendment, it must be effectuated with a warrant that is supported by probable cause.  United States v. Robertson, 305 F.3d 164, 167 (3d Cir. 2002).  But where an officer has not secured a warrant, the officer may still, "consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot."  Illinois v. Wardlow, 528 U.S. 119, 123 (2000) (discussing Terry v. Ohio, 392 U.S. 1 (1968)).  This type of investigatory stop is commonly referred to as a Terry stop.  "An officer cannot conduct a Terry stop simply because criminal activity is afoot.  Instead, the officer must have a particularized and objective basis for believing that the particular person is suspected of criminal activity."  United States v. Goodrich, 450 F.3d 552, 560 (3d Cir. 2006) (emphasis, citations, and internal quotations omitted); see United States v. Bonner, 363 F.3d 213, 217 (3d Cir. 2004).

Under the framework established in Terry, the first step is to determine the moment of seizure.  United States v. Torres, 534 F.3d 207, 210 (3d Cir. 2008).  The Third Circuit has established that a seizure occurs for Fourth Amendment purposes when there is either an application of force to restrain an individual's movement or a submission to a show of authority. United States v. Valentine, 232 F.3d 350, 358 (3d Cir. 2000) ("The police must apply physical force to the person being seized or, where force is absent, have the person seized submit to a show of police authority."); see also California v. Hodari D, 499 U.S. 624, 637-38 (1991).

In his moving papers, Thompson argued that he submitted to the police show of authority when he remained still in the corner of the parking lot as the officers approached him in their marked police vehicle, with its headlights and spotlight shining on him.  Def.'s Mot. to Suppress 2-4.  Courts must "determine if there has been a 'show of authority' using an objective test: 'whether the officer's words and actions would have conveyed . . . to a reasonable person' that

he was not free to leave." <u>Lowe</u>, 2015 WL 4032921, at \*4 (citing <u>Hodari D</u>, 499 U.S. at 628).

Under the present circumstances, it is the opinion of this Court that the approach of a marked

police car with its headlights and a spotlight illuminating a reasonable person is not sufficient to

convey to that person that they are not free to leave.[7]   Viewing the circumstances here in the

light most favorable to Thompson, the earliest that a reasonable person could have felt that they

were not free to leave was when Officer Rodriguez exited the patrol car and said "Come here.

What's your name?"[8]   However, immediately after Officer Rodriguez said these words to

Thompson, Thompson began to flee.   "When a suspect flees after a show of authority, the

moment of submission is often quite clear: It is when the fleeing suspect stops, whether

voluntarily or as a result of the application of physical force."  <u>Id.</u>  Here, since the show of

authority could not have occurred until Officer Rodriguez gave his first oral command to

Thompson, and since Thompson fled immediately following that oral command, Thompson did

not submit to the show of authority until the officers applied physical force to him when they

caught him in the middle of the parking lot.  Thus, Thompson was seized the moment the

officers physically apprehended Thompson, and not a moment sooner.

---

[7]      Even if the approach of a marked police car with its headlights and a spotlight illuminating a
reasonable person was enough to make that person feel that they were not free to leave, this Court
believes that the record here is insufficient to show that Thompson's lack of flight constituted a
submission to that purported show of authority.  While it is true that in <u>Lowe</u> the Third Circuit viewed the
individual's lack of flight as important to the submission determination, when viewed in context, it is
most reasonable to interpret any temporary lack of flight here as the result of Thompson's need to
complete his bodily functions, and not as a voluntary submission to police authority.  Importantly, the
record here indicates that Thompson turned to walk away from the corner of the parking lot as soon as he
was done urinating.  Hr'g Tr. 23:12-22, 74:20 – 75:4.

[8]      A reasonable person might still have felt free to leave even after Officer Rodriguez asked
Thompson's name and told him to approach, as "a seizure does not occur simply because a police officer
approaches an individual and asks a few questions."  <u>Florida v. Bostick</u>, 501 U.S. 429, 434 (1991).

C.  Reasonable Suspicion

When faced with a defendant's motion to suppress evidence, "the government must bear the burden of proving the existence of reasonable suspicion."  United States v. Coward, 396 F.3d 176, 180 (3d Cir. 2002).  Having established the moment of seizure, Terry requires consideration of the facts available to the officer at this moment of seizure to determine whether it was supported by reasonable suspicion.  Terry, 392 U.S. at 16, 27.  "In evaluating whether a particular stop was justified, courts must look at the totality of the circumstances surrounding the stop."  Bonner, 363 F.3d at 217.  Typically, a totality of the circumstances analysis requires consideration of a number of relevant factors.  See Wardlow, 528 U.S. at 124; Torres, 534 F.3d at 210; United States v. Brown, 159 F.3d 147, 149 (3d Cir. 1998); Goodrich, 450 F.3d at 561; Bonner, 363 F.3d at 217; Robertson, 305 F.3d at 167.  Under the totality of the circumstances here, Officer Rodriguez clearly has reasonable suspicion to seize Thompson on account of: (1) Officer Rodriguez's observation of Thompson urinating in public;[9] (2) Officer Rodriguez's observation of Thompson discarding a handgun;[10] (3) and Thompson's subsequent flight from the officers.[11]

---

[9]     The hearing transcript reflects that Officer Rodriguez identified public urination as a violation of City of Philadelphia Ordinance, 10-6042(2)(a).  Hr'g Tr. 21:9-14.  Based on this Court's independent research, it appears that Officer Rodriguez was mistaken or misspoke when he identified that section, or that there was a transcription error.  It appears that the most relevant section of the Philadelphia Code is Section 10-609(2), which makes it "unlawful for any person to urinate . . . on any private property used to accommodate the public, or on any private property without the permission of the owner."  Among other sections, public urination could also be addressed under 18 Pa. Cons. Stat. § 5503 (Disorderly Conduct), likely as a summary offense.  See Commonwealth v. Strickler, 757 A.2d 884, 890 n.9 (Pa. 2000) (noting that an officer's observation of public urination provides reasonable suspicion for further investigation of disorderly conduct).

[10]    Thompson's act of discarding the handgun in a public place is likely sufficient, in and of itself, to establish reasonable suspicion for his seizure.  See 18 Pa. Cons. Stat. § 2705 (Recklessly endangering another person), 18 Pa. Cons. Stat. § 6108 (Carrying firearms on public streets or public property in Philadelphia).

[11]    While headlong flight is not itself sufficient to justify a Terry stop, "flight upon noticing the police, *plus some other indicia of wrongdoing*, can constitute reasonable suspicion."  United States v. Navedo, 694 F.3d 463, 472 (3d Cir. 2012) (citation omitted); see also Wardlow, 528 U.S. at 124

D.  Forced Abandonment

Though Thompson did not specifically reference a "forced abandonment" theory in his motion to suppress, Thompson's moving papers suggests that the handgun should be suppressed due to the allegedly illegal nature and timing of Thompson's seizure.

"Although a person has a privacy interest in the contents of his personal [property] he forfeits that interest when he abandons his property."  United States v. Fulani, 386 F.3d 351, 354 (3d Cir. 2004) (citation omitted).  "In most cases, disclaiming ownership or physically relinquishing the property is sufficient to establish abandonment."  United States v. Harrison, 689 F.3d 301, 307 (3d Cir. 2012).

"'[W]hen abandonment of property is precipitated by an unlawful seizure' or search, that property is the fruit of the officer's unlawful activities and is inadmissible."  United States v. Johnson, 238 F.Supp.2d 663, 673 (D. Del. 2002) (quoting United States v. Coggins, 986 F.2d 651, 653 (3d Cir. 1993).  However, "when a defendant disperses evidence prior to being physically seized or submitting to an assertion of authority, such action does not constitute a 'forced abandonment.'"  United States v. Ware, 2013 WL 6283955, at *8 (E.D. Pa.  Dec. 2, 2013) (citing United States v. Rivera, 441 F. App'x 87, 89-90 (3d Cir. 2011)).  "[A]bsent any physical contact with the police or evidence that the defendant yielded to a show of authority, a claim for forced abandonment does not require suppression of the evidence the defendant abandoned prior to the seizure."  Johnson, 238 F.Supp.28 at 673; see also United States v. Taylor, 1992 WL 333589, at *5 (E.D. Pa. Nov. 9, 1992).

Here, Thompson abandoned the handgun prior to his seizure, and thus had no reasonable expectation of privacy with respect to the handgun.  See Hodari D, 499 U.S. at 629 (holding that

---

("Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such.").

cocaine abandoned by a defendant whilst fleeing from police was not the fruit of seizure and that the "motion to exclude evidence was properly denied").  Because Thompson discarded and abandoned his handgun prior to his lawful seizure, his motion to suppress the handgun must be denied.  See United States v. Richardson, 504 F. App'x 176, 182 (3d Cir. 2012) (affirming the denial of a motion to suppress where the defendant abandoned a handgun prior to being seized by law enforcement officers).

**III.   Conclusions of Law**

1.      A "show of authority" could not have occurred before Officer Rodriguez asked Thompson what his name was and told Thompson to approach the officers.

2.      Thompson never voluntarily submitted to any "show of authority," and was seized for the first time when Officer Rodriguez and Officer Harris applied physical force to Thompson in the middle of the parking lot.

3.      Officer Rodriguez had reasonable suspicion that Thompson had engaged in criminal activity prior to seizing Thompson.

4.      Thompson abandoned the handgun at issue prior to being seized by Officer Rodriguez and Officer Harris.

For the foregoing reasons, Thompson's Motion to Suppress will be denied.  An implementing Order follows.

14